## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **BILLY MILCHAK,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **3:23-CV-00441-ATB** |
| | § | |
| **HOME DEPOT, U.S.A., INC.,** | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

A unanimous jury found against Plaintiff Billy Milchak on his premises liability action against Defendant Home Depot, U.S.A., Inc. involving a lumber stack's collapse in one of its stores. The jury found that Plaintiff was "100%" responsible for proximately causing his own injury and that Defendant was not liable. ECF No. 110. The Court entered final judgment that same day. ECF No. 113.

Before the Court is Plaintiff's "Motion for a New Trial" (ECF No. 122) under Federal Rule of Civil Procedure 59, in which he asks for a new trial based on three grounds: an erroneous jury charge, insufficient evidence, and an erroneous evidentiary ruling. For the reasons below, the Court **DENIES** the Motion.

## STANDARD

Rule 59 states that courts may grant a motion for a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Courts may grant a new trial when, for example, they find that "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course."

*Sims v. City of Jasper, Tex.*, 117 F.4th 283, 288 (5th Cir. 2024) (citations omitted). Courts may also grant a new trial "when there is an erroneous evidentiary ruling at trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 417 (5th Cir. 2020).

But courts do not grant new trials "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Id.* (citations omitted). Indeed, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial[.]" Fed. R. Civ. P. 61. "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." *Id.* The burden of showing harmful error rests on the party seeking the new trial. *Jordan*, 977 F.3d at 417 (citations omitted).

## DISCUSSION

In his Motion, Plaintiff argues that three grounds warrant a new trial. First, Plaintiff argues that the Court's jury charge was erroneous because it used the term "injury" instead of "occurrence," and because it also defined the alleged dangerous condition narrowly as the "lumber stack." Mot. at 3–11. Second, Plaintiff argues that the verdict finding him solely liable was against the great weight of the evidence. *Id.* at 11–18. And third, Plaintiff argues that the Court erred in allowing Defendant's biomechanical expert, Dr. Jeffrey Broker, to testify about "injury causation" because Plaintiff was prohibited from presenting any injury or causation evidence. *Id.* at 18–20. The Court addresses Plaintiff's arguments in that order.

## I.    Whether the Jury Charge Was Erroneous

Parties requesting a new trial by challenging the jury instructions "must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *RSBCO v. United States*, 104 F.4th 551, 555 (5th Cir. 2024).   Even if erroneous, a challenged jury instruction does not warrant a new trial if the overall record shows that it could not have affected the outcome.  *Id.*

The jury charge section relevant to Plaintiff's arguments is the following:

> To succeed on his premises liability claim, Plaintiff BILLY MILCHAK must prove by a preponderance of the evidence that Defendant HOME DEPOT's negligence proximately caused his injury. With respect to the lumber stack, Defendant HOME DEPOT was negligent if:

> *First:*    The lumber stack posed an unreasonable risk of harm;

> *Second:*    Defendant HOME DEPOT knew or reasonably should have known of the danger; and

> *Third:*    Defendant HOME DEPOT failed to exercise ordinary care to protect Plaintiff BILLY MILCHAK from the danger, by both failing to adequately warn him of the lumber stack and failing to make that condition reasonably safe.

> "Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom.  There may be more than one proximate cause of an injury.

> "Ordinary care," when used with respect to the conduct of Defendant HOME DEPOT as an owner or occupier of a premises, means

that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

You must **also** determine whether Plaintiff BILLY MILCHAK's own negligence proximately caused his injury.

"Negligence," when used with respect to the conduct of Plaintiff BILLY MILCHAK, means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an injury, and without which cause such injury would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result.

Jury Instructions at 10–11, ECF No. 107 (bold, italics, and underline in original).

### A.    The use of "injury" in the jury charge was not error

Plaintiff first faults the Court's use of "injury" instead of "occurrence" in its jury charge that tracked Texas Pattern Jury Charge ("TPJC") § 66.4.[1]  Mot. at 5

---

[1] TPJC 66.4 provides the following:

Did the negligence, if any, of those named below proximately cause the [*injury*] [*occurrence*] in question?

With respect to the condition of the premises, *Don Davis* was negligent if—

1. *the condition* posed an unreasonable risk of harm, and
2. *Don Davis* knew or reasonably should have known of the danger, and
3. *Don Davis* failed to exercise ordinary care to protect *Paul Payne* from the danger, by both failing to adequately warn *Paul Payne* of *the condition* and failing to make that condition reasonable safe.

"Ordinary care," when used with respect to the conduct of *Don Davis* as an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

Tex. Pattern Jury Charges § 66.4 (brackets and italics in original).

(citing Jury Instructions, ECF No. 107).  He argues that the jury charge's use of "injury" unfairly prejudiced him because the Court "expressly" prohibited him from presenting any injury or causation evidence during the trial's liability phase.  *Id.* at 4–7.  Plaintiff states that he was ready "to present medical records that document the injuries caused by the falling boards, [and] expert medical testimony by Dr. Robert Urrea, M.D." and by "Dr. Brandon Goff," but that the Court "prohibited" him from doing so.  *Id.* at 6–7.

In its opposition, Defendant contends that the Court's decision to bifurcate the trial did not prejudice Plaintiff in his ability to present injury or causation evidence, and that the Court's use of "'injury' was necessary to effectuate Chapter 33 and Texas's proportionate responsibility laws" as TPJC § 66.1 instructs.  Resp. in Opp'n at 3–7, ECF No. 127.  After due consideration, the Court agrees with Defendant.

### a)     *Plaintiff was not barred from presenting injury or causation evidence*

First, the Court addresses Plaintiff's claim that it expressly prohibited him from presenting any injury or causation evidence during the trial's liability phase.  To begin, Plaintiff cites no order or transcript that supports his claim.  In fact, the record belies Plaintiff's claim.

Two days before the Final Pretrial Conference, the Court ordered, under Federal Rule of Civil Procedure 42(b), that the jury trial in this case be bifurcated to conserve judicial resources and promote efficiency by avoiding unnecessary presentation of damages evidence if Plaintiff failed to prove liability.  Order at 1–2, ECF No. 78.  The Court reached this conclusion after reviewing the parties' pretrial

submissions, which identified a total 32 trial witnesses—only 6 of whom seemed relevant to liability and 26 to damages—and showed that most unresolved pretrial disputes concerned damages. *Id.* At no point did the Court make any evidentiary rulings in reaching that conclusion or ordering bifurcation—let alone prohibit Plaintiff from presenting any injury or causation evidence during the liability phase.

During the June 5, 2025 Final Pretrial Conference, the Court discussed trial logistics with the parties, including its decision to bifurcate the jury trial. When addressing witnesses, the Court first asked Plaintiff's counsel to identify Plaintiff's liability-phase witnesses. Pretrial Conf. Tr. at 11:6-8, ECF No. 119. Plaintiff's counsel identified four witnesses for the liability phase: (1) Jason English, Plaintiff's safety engineering expert; (2) Plaintiff; (3) Christine Milchak, Plaintiff's wife; and (4) Diana Sundermann, Defendant's general manager of the store where the incident occurred. *Id.* at 11:14–12:8. Plaintiff's counsel also identified a potential additional witness, David Martinez, an employee working at Defendant's store at time of the incident, but noted that he was not one of Plaintiff's four "core will-call witnesses" for the liability phase. *Id.* at 12:9–13:6.

The Court then asked Plaintiff's counsel to identify Plaintiff's damages-phase witnesses. *Id.* at 13:25–14:2. Plaintiff's counsel identified four: (1) Dr. Brandon Goff, Plaintiff's life care plan expert; (2) Plaintiff; (3) Christine Milchak; and (4) Dr. Robert Urrea, Plaintiff's treating physician. *Id.* at 14:3-14. At no point during the Final Pretrial Conference did the Court make any evidentiary rulings—let alone prohibit Plaintiff from presenting evidence or witnesses on his injury or its causation during the liability phase. *See also id.* at 23:3-5 ("THE COURT: All right. Okay. And again,

I will be making my call regarding evidentiary issues regarding the exhibits at the time of trial."). To the contrary, it was Plaintiff's own counsel who classified Dr. Goff and Dr. Urrea as damages-phase witnesses, the same witnesses who Plaintiff now claims the Court prohibited him from calling during the liability phase. Mot. at 6–7.

Lastly, the trial transcripts reveal no ruling prohibiting Plaintiff from presenting injury or causation evidence. If anything, they show that it was *Plaintiff*—not the Court—who first tried to limit such evidence during the liability phase, objecting during Defendant's cross-examination of his retained expert, Mr. English:

> MR. MIMARI: Your Honor, I object on the basis that this goes beyond liability. She's talking about impact and injury and that's not what the – this trial phase is about. The liability aspect here is Home Depot's actions to maintain the aisle, not whether or not there's a possibility of an injury.

June 17, 2025 Trial Tr. at 245:11-16, ECF No. 131. Indeed, the Court *overruled* the objection—showing that its evidentiary rulings were not guided by any purported prohibition on injury or causation evidence, contrary to Plaintiff's claim. *See id.* at 246:14. In fact, had the Court sustained Plaintiff's objection at the time, it would have done exactly what Plaintiff now claims prejudiced him. So, any purported prohibition was self-imposed: Plaintiff proceeded during the liability phase based on his own belief that he could not present such evidence, even though the Court never imposed or suggested any such prohibition.

### b) *Plaintiff did present injury and causation evidence*

Second, despite this purported self-imposed prohibition, the trial transcripts show that Plaintiff did present injury and causation evidence to prove his premises

liability claim during the liability phase. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471–72 (Tex. 2017) (premises liability claims arise when a person is injured due to a defect on the property that the owner failed to make safe).

For example, Plaintiff's wife testified that after she heard the boards fall "like a Jenga set," Plaintiff was not feeling well and had "pain on the side of his face." June 16, 2025 Trial Tr. at 65:22–66:2; 67:16-23, ECF No. 130. Next, Ms. Sundermann testified that Plaintiff and his wife reported to her that "2x4x10s" fell "toward him, hitting his left ear and jaw," and that he suffered from "pain and dizz[iness]." June 17, 2025 Trial Tr. at 16:16–17:5. Ms. Sundermann even testified that she did not "deny that this incident occurred like that." *Id.* at 17:6-8. Further, besides eliciting testimony from Ms. Sundermann about Defendant's safety policies, Plaintiff's counsel also elicited testimony from her about how, when shoppers manipulate a lumber stack, the boards can become unstable and fall, potentially causing them serious injuries. *See, e.g., id.* at 29:2-16; 30:1-5, 24–31:17; 42:23–43:5.

Mr. English, whose expert testimony focused on general retail safety policies and Defendant's failure to comply with its own policies, also testified about causation. He began testifying that his role "as an expert witness in safety" in this case was "to evaluate the circumstances surrounding [Plaintiff's] particular instant event, to evaluate *the causative factors* of that event, along with the responsibility of the various parties involved." *Id.* at 133:15-20 (emphasis added). He then testified on his understanding about how the event occurred and that, based on the evidence he reviewed and evaluated, he had no reason to doubt Plaintiff's account. *See id.* at 145:11-16.

Additionally, Plaintiff's counsel, anticipating the causation testimony of Defendant's liability-phase expert, Dr. Broker, elicited testimony from Mr. English about the amount of force required "to pull the wood down to cause it to fall" based on "the angle of the cantilever and flat stacking." *Id.* at 174:9-23. Indeed, the fact that Plaintiff's counsel anticipated Dr. Broker's causation testimony and elicited testimony to preempt it further belies Plaintiff's claims that a prohibition on injury and causation evidence existed, as well as his claim that he could not present such evidence.

On cross-examination, Mr. English also answered several questions about how boards on the lumber stack could have become unstable based on customer interaction. June 18, 2025 Trial Tr. at 21:3–22:4, ECF No. 132. Mr. English even testified on redirect that, based on the evidence he reviewed and evaluated, he disagreed that Defendant "did nothing to create the condition that caused this accident" and that Plaintiff "was responsible for causing his injuries." *Id.* at 67:25–68:5.

And most importantly, Plaintiff himself testified that he suffered pain, dizziness, and a "flash knockout knockdown" after the "very heavy" boards fell, struck him in the head and jaw, and forced him to catch them as they fell and his knees buckled. *See id.* at 82:3–85:15. He also testified that he did not "feel good enough" to give Ms. Sundermann a written statement because he "was in a lot of pain" and "was dizzy." *Id.* at 137:17-19.

Still, Plaintiff insists that he should have been allowed to call Dr. Goff and Dr. Urrea to prove his injuries and their causation through expert testimony and

supporting medical records.  Mot. at 6–7; Reply at 6, ECF No. 128.  He claims that Dr. Urrea, who performed surgery for injuries caused by the falling boards, and Dr. Goff, who examined him and determined his future care needs, would have presented medical records identifying the injuries and the therapy, pain management, and surgery that Plaintiff required afterward.  Mot. at 6–7.

But as mentioned above, Plaintiff himself identified both doctors as witnesses for the *damages* phase only.   What is more, Plaintiff conflates "injury" with "damages"—two analytically distinct concepts, whose distinction is even more pronounced in bifurcated trials.  *See Bondies v. Glenn*, 119 S.W.2d 1095, 1098 (Tex. Civ. App. 1938), *writ dismissed* ("Injury and damages are not synonymous.").

"Under tort law, injury is distinct from the losses or damages that result from an injury," a distinction that courts have made "[s]ince before the Founding." *Marijuana, Inc. v. Horn*, 604 U.S. 593, 630 (2025) (Kavanaugh, J., dissenting, joined by Roberts, C.J., and Alito, J.).  "Stated simply, injury is 'the illegal invasion of a legal right; damage is the loss, hurt, or harm which results from the injury.'"  *Id.*

"Tort liability requires proof of [fact of injury], that is, proof that there was an injury, regardless of how much."  *Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir. 1995) (Posner, J.); *see also Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 909 (Tex. App.-Houston [14th Dist.] 2009) (premises liability claims "require[] an injury as a result of a condition of the premises.").  In a bifurcated trial, "liability *must* be resolved before the question of damages is reached."  *See Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) (emphasis in original). It follows then, that "the *fact of injury* belongs in the first trial and the *quantification*

*of the injury* by means of an assessment of damages in the second." *Hydrite*, 47 F.3d at 891 (emphasis added).

Here, as discussed above, Plaintiff presented evidence during the liability phase intending to establish the *fact of his injuries*, how an alleged defect in Defendant's store caused those injuries, and how Defendant allegedly failed to exercise reasonable care in protecting him from that defect.  In contrast, the evidence that Plaintiff intended to present through Dr. Urrea and Dr. Goff, as outlined in his Motion, focuses on the *quantification of his injuries* and how Defendant's alleged negligence contributed to the severity of those injuries or the amount of damages that he sought.  While there may be some overlap between the evidence of the fact of his injuries and that of their quantification, the distinction between the two remains clear.

c)     ***The jury charge used "injury" because TPJC § 66.1 instructs to use that term when the trial evidence may support a finding of plaintiff negligence that is injury-causing***

And third, Plaintiff's argument that the jury charge was "materially flawed" for using "injury" instead of "occurrence" is misplaced.  Mot. at 5.  According to Plaintiff, because the Court bifurcated the trial and because "the causal nexus between an event sued upon and injuries is strictly referable to the damages portion of a plaintiff's cause of action," any evidence of his injuries and their causation should have been confined to the damages phase. *Id.* (citing *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 732 (Tex. 1984)).  So, he contends that the use of "injury" prejudiced him by shifting the focus at the liability phase *from* whether he proved that Defendant was negligent in failing to remedy the unstable lumber stack that later

collapsed *to* whether he proved his injuries and how the lumber stack's collapse caused them—evidence Plaintiff claims he could not present. *Id.* at 5–6.

But Plaintiff's argument ignores two critical points. One, his argument relies on a rule that comes from a Texas Supreme Court case addressing, in the *default judgment* context, to what a defendant admits in a personal injury case by way of default and what a plaintiff must still prove to obtain damages:

> From the rule that a default judgment conclusively establishes the defendant's liability, it follows that a default judgment admits that the defendant's conduct caused the event upon which the plaintiff's suit is based. Whether the event sued upon caused any injuries to the plaintiff is another matter entirely. The causal nexus between the event sued upon and the plaintiff's injuries is strictly referable to the damages portion of the plaintiff's cause of action. Even if the defendant's liability has been established, proof of this causal nexus is necessary to ascertain the amount of damages to which the plaintiff is entitled.

*Morgan*, 675 S.W.2d at 732. Based on what has been already discussed above on bifurcation, this default judgment rule that Plaintiff relies on is inapplicable to the bifurcated trial here, as Defendant neither admitted liability by way of default, a request for admission, or stipulation.

And two, as explained during the June 23, 2025 Jury Charge Conference, the Court's jury charge used "injury" instead of "occurrence" based on the instructions in the TPJC. *See* June 23, 2025 Trial Tr. at 80:4–82:13, ECF No. 129. The premises-liability charge here tracks the language of TPJC § 66.4, which in turn refers to TPJC § 66.1 on the issue of when a charge must use "injury" or "occurrence." *See* Tex. Pattern Jury Charges § 66.4, Comment ("Use of 'injury' or 'occurrence.' *See* PJC 66.1."). TPJC § 66.1 provides that:

"Injury" should ordinarily be used, particularly if there is evidence of the plaintiff's preoccurrence negligence that is "injury causing" but not "occurrence causing," such as the failure to wear a seatbelt. *Nabors Well Services, Ltd. v. Romero*, 456 S.W.3d 553, 563–64 (Tex. 2015); see also Tex. Civ. Prac. & Rem. Code § 33.011(4) (defining "percentage of responsibility" in terms of "causing or contributing to cause in any way . . . the personal *injury*, property damage, death, or other harm for which recovery of damages is sought") (emphasis added).

Tex. Pattern Jury Charges § 66.1 (emphasis in original). In short, TPJC § 66.1 directs the use of "injury" or "occurrence" in a jury charge to guide how the jury evaluates causation and allocates responsibility in a premises-liability case, depending on whether the evidence may support a finding of plaintiff negligence. *See also Nabors*, 456 S.W.3d at 562–63 (discussing Tex. Civ. Prac. & Rem. Code § 33.011(4), "the proportionate-responsibility statute" on which TPJC § 66.1 is based).

In a case where there is no evidence of plaintiff negligence, the charge should use "occurrence," directing the jury to focus only on whether the defendant was negligent and caused the occurrence. As the plaintiff's injury resulted from the occurrence in this example—not from any fault of his own—then the plaintiff's conduct is irrelevant to his injury's causation. But when the evidence may support a finding of plaintiff negligence, the charge should use "injury," directing the jury to consider *also* whether the plaintiff' was negligent and contributed to causing or worsening his own injury, and allowing the jury to allocate responsibility based on each party's negligent conduct and its causal role. *Id.* at 562 ("[T]he question is not simply who caused the [occurrence], but who caused the plaintiff's injuries."); *see also id.* at 563 (Tex. Civ. Prac. & Rem. Code § 33.011(4), on which TPJC § 66.1 is based, "calls for an apportionment of fault for 'personal injuries' and 'death' rather than for

the underlying occurrence that introduced a sequence of events in which the end result is potentially influenced by whether the plaintiff acted unreasonably or even broke the law.").

A common example is a car accident. A defendant may be negligent in causing the collision (the occurrence) and thus liable for the plaintiff's resulting injuries. But if the plaintiff is also negligent—such as by failing to wear a seatbelt—his own negligence may cause additional injuries or worsen the ones resulting from the collision. *Id.* at 562 ("[M]ost would say a plaintiff who breaks the law or otherwise acts negligently by not using a seat belt is at least partially responsible for the harm that befalls him. This is true even if he did not cause the car accident, provided it can be shown the failure to buckle up exacerbated his injuries."). In that situation, the jury must apportion responsibility between all whose negligent conduct combined to cause the plaintiff's injuries. *Id.* at 564 ("A jury can consider a plaintiff's pre-occurrence, injury-causing conduct alongside his and other persons' occurrence-causing conduct."). Of course, depending on the facts, a jury could also find that the defendant was not negligent (and thus not responsible for the plaintiff's injuries), that the plaintiff was the only negligent party, and that the plaintiff's negligent conduct was the proximate cause of his injuries—a finding that parallels the one here.

Here, the jury heard evidence that supported a finding that Plaintiff negligently handled the lumber stack: his own testimony. On direct examination, Plaintiff recounted how he was standing "almost from the left to the middle" of the lumber stack and that "the wood came crashing down" when he "lifted a piece of wood up." June 18, 2025 Trial Tr. at 82:3-13.

On cross-examination, Plaintiff testified that "[t]he wood was not falling at the time that [he] walked up to it" and that the boards "only fell after" he "moved" one of them. *Id.* at 109:18-20; 112:17-19. But when defense counsel asked Plaintiff which "board [he] moved" and he could not recall, defense counsel showed Plaintiff that, during his deposition, he had testified "it was one of the boards that were from behind the first row." *Id.* at 126:19-23, 127:8-13. As to his positioning in front of the lumber stack, Plaintiff testified that he was "standing more towards the middle," but then defense counsel showed him that, during his deposition, he had testified then that he was "[o]n the left." *Id.* at 125:20–126:12. And when defense counsel asked him about what he anticipated would happen after pulling the board off, Plaintiff clarified that he "never pulled the board off," and then revealed that he "lifted the board up" *and* "flipped it . . . over," after which "the rest of [the boards] fell." *Id.* at 134:15–135:3.

Further, the jury could have considered Plaintiff's testimony about how he handled the lumber stack to be either occurrence-causing or injury-causing. For example, the jury could have concluded that Plaintiff's handling of the lumber stack caused its collapse based on the way he handled a board (lift up and flipped over), the board he chose to handle (behind the first row), or where he stood in front of the lumber stack. The jury could have also instead concluded that Plaintiff's handling of the lumber stack affected how its collapse injured him, such as by placing him in a worse position when the boards fell, increasing the number of boards that fell on him, or altering the collapse dynamics in a way that caused him additional injuries. Considering that the jury found that Plaintiff was "100%" responsible for proximately causing his own injury, the verdict strongly suggests that the jury found Plaintiff's

handling of the lumber stack to be negligent and occurrence-causing—that is, to have caused its collapse. *See* ECF No. 110. Indeed, Plaintiff seems to agree that the verdict suggests the same. *See* Mot. at 12 (arguing that the jury's "finding of *no occurrence-causing liability* at all on the part of [Defendant]" was against the great weight of the evidence (emphasis added)).

In sum, the Court concludes that the jury charge's use of "injury" instead of "occurrence" was not error because TPJC § 66.1 instructs courts to use that term when the trial evidence may support a finding of plaintiff negligence that is injury-causing—which it did here. Additionally, because Plaintiff did in fact present injury and causation evidence, he suffered no prejudice from the jury charge's use of "injury."

## B.    Defining the condition as "the lumber stack" was not error

Plaintiff next faults the Court for defining, in the jury charge, the alleged dangerous condition of the premises narrowly as the "lumber stack" and not broadly as "condition or condition of the premises," as he proposed. Mot. at 7–8. He argues that the alleged dangerous condition here was instead the "elevated lumber cantilever display rack" because of the "defective condition of the [lumber] restraint[] [system]." *Id.*; Reply at 7. He contends that the alleged dangerous condition here is similar to the one in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983), where it was the defective "method of display" that "exposed customers to an unreasonable risk of harm." Mot. at 8–9.

Defendant responds that defining the alleged dangerous condition as the "lumber stack" was appropriate because "Milchak was not injured by the display rack" but by the "lumber stack falling." Resp. in Opp'n at 8–9. It contends that "a

condition is only actionable if it is dangerous itself," not "if 'it could only *cause* a dangerous condition.'" *Id.* at 8 (emphasis in original) (quoting *City of San Antonio v. Rodriguez*, 931 S.W.2d 535, 536 (Tex. 1996)).  Defendant also argues that even if the method of display here was the alleged dangerous condition as Plaintiff argues, the term "lumber stack" would still be in line with *Corbin* and not prejudicial because it "necessarily includes the lumber itself and the manner in which it was displayed ('stacked')."    *Id.*    at    8–9    (citing    *Stack*,    Merriam-Webster.com    Dictionary, https://www.merriam-webster.com/dictionary/stack ("an ordinary pile or heap")).  The Court agrees with Defendant.

To begin, Plaintiff fails to explain how the jury, based on the trial evidence, would have construed the "condition or condition of the premises" to encompass the *specific* elevated lumber cantilever display rack he was standing in front of, or even the defective condition of the lumber restraint system in *that* rack.  Indeed, it is unclear why "condition or condition of the premises" would have had the effect Plaintiff claims it would have had, especially when considering the definitions of "premises" that he offers in his reply: a "building or part of a building with its grounds or other appurtenances" and "lands and tenements; an estate, including land and buildings thereon; land and its appurtenances."  Reply at 8 (cleaned up).

As Defendant argues in its opposition, using this broad, unclear definition of what the alleged dangerous condition was here would have been reversible error because it "would have allowed the jury to find [Defendant] liable for some other, non-dangerous condition."  Resp. in Opp'n at 9 (citing *Rodriguez*, 931 S.W.2d at 536–37 (reversing verdict due to trial court's failure to define the alleged dangerous

- 17 -

"condition") ("The leaky roof was not itself a dangerous condition; it could only cause a dangerous condition . . . On retrial, the jury should be instructed that the allegedly dangerous condition was the water Rodriguez claims was on the floor.")).

Nor did the trial evidence support Plaintiff's claim that the alleged dangerous condition here was the method of display as in *Corbin*.  As this Court explained in its June 23, 2025 Memorandum Order[2]:

> In *Brookshire Grocery Co. v.* Taylor, 222 S.W.3d 406 (Tex. 2006), the Texas Supreme Court explained that "an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place [at which the] injury occurs, *not some antecedent situation that produced the condition.*" *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006) (emphasis added). For example, the Texas Supreme Court explained that, in an earlier case, "water on the floor of a basketball court could be an unreasonably dangerous condition, but not the leaky roof that would eventually allow water to drip onto the floor if it rained." *Id.* at 408 (citing *City of San Antonio v. Rodriguez*, 931 S.W.2d 535, 536–37 (Tex. 1996) (per curiam)). It also explained that, in another case, "a grocery store's self-service display of loose grapes in a recessed bowl on a rimmed table standing on a non-skid floor and surrounded by mats and warning cones was not an unreasonably dangerous condition; rather, the grape on which the plaintiff slipped was the dangerous condition." *Id.* (citing *H.E. Butt Grocery Co. v. Resendez*, 988 S.W.2d 218, 218–219 (Tex.1999) (per curiam)). The Texas Supreme Court further distinguished these cases from another in which it held that a store's self-service display of loose grapes in an open, slanted bin above a bare, green linoleum floor was itself an unreasonably dangerous condition because, together "with the absence of any covering on the store's tile floor," the display frequently caused the grapes to become floor hazards. *Id.* (citing *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 297 (Tex. 1983)).

---

[2] This Court issued its June 23, 2025 Memorandum Order to address Defendant's motion to exclude evidence of a different lawsuit through the testimony of its expert witness, Dr. Broker.  Defendant filed its motion to exclude after Plaintiff had already presented his case-in-chief.  *See* ECF No. 100.  In his opposition brief to such motion, Plaintiff contended that "[a]t the core of [his] cause of action is that the missing restraint rod was a hazardous condition that [Defendant] knew or should have known about."  ECF No. at 101 at 7.  In resolving the permissible scope of Dr. Broker's testimony, the June 23, 2025 Memorandum Order first addressed Plaintiff's contention about the alleged dangerous condition here based on the trial evidence that he presented during his case-in-chief.

Based on these cases, the Texas Supreme Court in *Brookshire* rejected the plaintiff's argument that a soft-drink dispenser, surrounded by three mats, was the unreasonably dangerous condition in that case, holding instead that the ice on the bare floor where she slipped was the dangerous condition. *Id.* It reasoned that no evidence suggested that "the soft drink dispenser was set up in such a way that ice on the floor was a greater danger than one would ordinarily encounter with such dispensers, or that customers, though prone to spills, were any more prone around this dispenser." *Id.* It also rejected the plaintiff's argument that the dispenser was itself unreasonably dangerous because "there should have been more mats and warning signs." *Id.* It reasoned that such arguments were relevant to whether the defendant failed to exercise ordinary care, as there is almost always more that could be done to prevent accidents. *Id.* It emphasized that "[a] condition is not unreasonably dangerous simply because it is not foolproof," because "[o]therwise, similar evidence could be used to show that the entire grocery store was unreasonably dangerous." *Id.*

It follows then, that as in *Brookshire*, Plaintiff cannot claim here that the absence of a safety pole was the alleged dangerous condition, rather than the lumber stack that became unstable. Indeed, the safety poles here are analogous to the mats in *Brookshire*: just as the mats were intended to mitigate the risk posed by spilled ice resulting from foreseeable customer interactions, the safety poles here similarly mitigate the risk posed by unstable lumber stacks resulting from foreseeable customer interactions. **No evidence presented shows that the lumber stack or its rack here were more unstable than ordinary stacks or racks without customer interaction, or that customers were any more likely to destabilize this particular stack or its rack through foreseeable manipulation.**

Memorandum Order at 6–8, ECF No. 105 (emphasis in bold added).

Even so, Plaintiff insists that Mr. English did testify that "dimensional lumber offered for sale on elevated racks is inherently unstable and prone to falling while being shopped," which is why retail stores have lumber restraint systems "to prevent the lumber from falling on customers." Reply at 7. He argues that "[i]f the display were in the condition [that Defendant's policy] requires, [Defendant] would have satisfied [its] duty to make the condition reasonably safe." Mot. at 9.

But Plaintiff conflates what evidence establishes that a condition poses an unreasonable risk of harm *with* what evidence establishes that a defendant failed to exercise reasonable care to protect invitees from *that* condition.  "[T]he mere fact that a store has [an elevated lumber cantilever display rack] cannot, without more, be evidence of a condition on the premises that poses an unreasonable risk of harm." *Brookshire*, 222 S.W.3d at 408 (quoting *Resendez*, 988 S.W.2d at 219).  Again, as the Texas Supreme Court explained in *Brookshire*, "[a] condition is not unreasonably dangerous simply because it is not foolproof."  *Id.*  As Defendant points out in its opposition, Plaintiff's argument would have allowed the jury to find liability for having an allegedly defective lumber restraint system *regardless* of the danger posed by the lumber stack itself.  Resp. in Opp'n at 9; *see also* Reply at 9 ("The lumber stack, regardless of its condition, caused no injury.").

So, Mr. English's testimony is instead "relevant to [Plaintiff's] contention that [Defendant] did not exercise reasonable care, but [it is] not evidence that the [elevated lumber cantilever display rack] itself was unreasonably dangerous." *Brookshire*, 222 S.W.3d at 408.  "Otherwise, similar evidence could be used to show that [Defendant's entire] store was unreasonably dangerous, since it is almost always the case that something more could have been done to prevent a customer from being struck by an article falling off a shelf or from slipping on the floor."  *Id.*

And lastly, as Defendant contends in its opposition, even if Plaintiff is correct in that the method of display was the alleged dangerous condition here, he provides no argument as to why defining the condition as the "lumber stack" was so prejudicial to warrant a new trial.  Resp. in Opp'n at 9–10.  Indeed, Plaintiff does not say why

the jury would not construe the "lumber stack" to include "the manner in which the lumber was placed" (how high the lumber was stacked and whether it was flat) and its "display rack" (the elevated rack and its lumber restraint system). *Id.* In other words, Plaintiff fails to show how defining the alleged dangerous condition as the "lumber stack" affected the outcome of the case based on the "overall record." *RSBCO*, 104 F.4th at 555.

Thus, the Court concludes that Plaintiff fails to show "that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations," and that he was prejudiced. *Id.*

## II.    The Verdict Was Not Against the Great Weight of the Evidence

Next, Plaintiff argues that the jury's verdict that he was "100%" responsible for his own injury was against the great weight of the evidence. Mot. at 11. He claims that "all evidence was that [he] was shopping the lumber as any reasonable customer would at the time of the incident, and [that] there was no evidence of any act or omission on [his] part . . . that was outside of what a reasonable customer shopping" would have done. *Id.* at 12, 17–18. He also argues that the trial evidence established that Defendant had failed to follow its own policy in maintaining the lumber restraint system, for which Defendant breached its duty to protect Plaintiff while he shopped for lumber. *Id.* at 13–15.

In its opposition, Defendant contends that the jury was free to weigh the credibility of all witnesses, including Plaintiff's, who was impeached after defense counsel showed that he changed his testimony between his deposition and trial. Resp. in Opp'n at 10–13. It also contends that Plaintiff's argument goes against well-

established Texas law that a company's internal policies do not establish the standard of care, such that Defendant's failure to follow its own policies does not, without more, establish its negligence. *Id.* After reviewing the trial evidence, the Court agrees with Defendant.

A court may grant a motion for new trial "if the jury verdict was against the great weight of the evidence," not merely against the greater weight of the evidence or a preponderance of the evidence. *Cates v. Creamer*, 431 F.3d 456, 460 (5th Cir. 2005); *Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 497 (5th Cir. 2002); *Scott v. Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989). In other words, the movant must show "an absolute absence of evidence to support the jury's verdict." *Seibert v. Jackson Cnty., Mississippi*, 851 F.3d 430, 439 (5th Cir. 2017). "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988).

First, as already discussed above, the jury heard evidence that supported a finding that Plaintiff negligently handled the lumber stack: his own testimony. *See supra* section I, A, c. The jury was free to weigh Plaintiff's testimony and draw any inferences about how he handled the lumber stack, as well as to conclude that he was the sole cause for its collapse based on the way he handled a board (lift up and flipped over), the board he chose to handle (behind the first row), and where he stood in front of the lumber stack. The jury was also free to weigh Plaintiff's credibility based on

any inconsistencies between his deposition testimony and his trial testimony, as well as his ability to recall the circumstances of the incident.

To be sure, as Plaintiff points out, Ms. Sundermann testified that she agreed that he was "just shopping as a reasonable customer would at the time of the incident." June 17, 2025 Trial Tr. at 62:18-20. But the jury was free to weigh Ms. Sundermann's testimony against Plaintiff's, especially because her testimony was based on what he reported to her shortly after the incident without the benefit of his full testimony at trial. *Compare id.* at 16:16-22 (Sundermann) *with* June 18, 2025 Trial Tr. at 134:15–135:3 (Plaintiff).

The jury also heard testimony from Defendant's biomechanical expert, Dr. Broker, that contested Plaintiff's account about how the lumber stack collapsed. Dr. Broker testified that he conducted a series of tests to assess and validate whether the physics match with Plaintiff's account. *See id.* at 177:6–190:5; June 23, 2025 Trial Tr. at 11:18-22. He discussed his test findings and opined that Plaintiff's account about how the boards fell and where he was hit did not match with the physics of the tests. *See* June 18, 2025 Trial Tr. at 191:5–197:7; June 23, 2025 Trial Tr. at 21:25–23:5; 27:17–28:6; 32:18–37:4; 38:10–41:18, 52:20–60:14. The jury was free to weigh Dr. Broker's expert testimony (including its bases and sources) against Plaintiff's testimony about his handling of the lumber stack. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."). The jury was also free to weigh Dr. Broker's credibility based on his expert qualifications and

potential bias as a retained expert, including his history of testifying for defendants in premises liability cases nationwide.  *See* June 18, 2025 Trial Tr. at 172:5–177:5, 197:15–205:23; June 23, 2025 Trial Tr. at 23:13–27:23; 41:24–51:18.

And second, Defendant is correct that, even if the jury heard evidence about its failure to follow its own policies, that does not mean that the jury could have only concluded that Defendant breached its duty to protect Plaintiff while he shopped for lumber.  Resp. in Opp'n at 11–12.  A defendant's self-imposed policies "do not, taken alone, establish the applicable standard of care."  *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92 (Tex. 2004).  Because a defendant's self-imposed policies may exceed the applicable standard of care, holding otherwise would "unfairly penalize" those "who strive for excellence" and "benefit those who choose to set their own standard of care no higher than that found as a norm in the same or similar localities at the time."  *Id.* at 92–93 (quoting *Titchnell v. United States,* 681 F.2d 165, 173 (3d Cir.1982)).

Besides, even if the jury concluded that Defendant breached its duty to protect Plaintiff, it could have still concluded that he was "100%" responsible for his injury. As the jury charge here based on TPJC § 66.4 provides, the question for the jury was whether "Defendant['s] . . . negligence *proximately caused* [Plaintiff's] injury."  So, the fact that the jury could find Defendant negligent did not preclude it from concluding that some other cause—not Defendant's negligence—proximately caused Plaintiff's injury.  Again, the jury heard evidence supporting a finding that Plaintiff negligently handled the lumber stack and that such handling was the sole cause for its collapse— that is, *regardless* of whether Defendant was negligent.  *See supra* section I, A, c.

Thus, the Court concludes that Plaintiff fails to show that the jury verdict here finding him "100%" responsible for his own injury was against the great weight of the evidence. *Cates*, 431 F.3d at 460.

## III.    Admitting Dr. Broker's Biomechanical Testimony Was Not Error

Lastly, Plaintiff faults the Court for admitting Dr. Broker's testimony on "injury causation" because that testimony was "strictly limited to the damages phase of the trial." Mot. at 18–19. He argues that Dr. Broker's testimony "should have been limited to occurrence-causing liability," but instead, the Court permitted Dr. Broker to testify about how "the falling boards could not have caused injury to Plaintiff's head and jaw" based on the way the boards fell. *Id.* Plaintiff argues that he was prejudiced because he claims that the Court expressly prohibited him from presenting any injury or causation evidence to refute Dr. Broker's testimony. *Id.*

In its opposition, Defendant responds that Dr. Broker's "biomechanical testimony here showed that [Plaintiff's] *positioning* mattered for what injury he received, so the testimony was necessarily referable both to causation generally and to any negligence of [Plaintiff] himself." Resp. in Opp'n at 14 (emphasis in original). Thus, Dr. Broker's testimony did not go "into the details of the scope and *amount* of [Plaintiff's] actual injuries but instead [told] the story about how the *occurrence* happened," which was "perfectly relevant" during the trial's liability phase. *Id.* (emphasis in original). After due consideration, the Court agrees with Defendant.

The problem with Plaintiff's argument is that it merges two distinct analyses into one: (1) the biomechanical analysis (how the lumber stack collapsed based on Plaintiff's account of how it happened), and (2) the medical analysis (whether Plaintiff

was injured by falling boards).  But Dr. Broker's testimony addressed only the first analysis—it contested Plaintiff's account about how the lumber stack collapsed, not whether Plaintiff was injured by the falling boards.[3]  And to the extent that Dr. Broker's testimony touched on where the boards might have struck Plaintiff, it still related to the biomechanical analysis because it did not contest whether the falling boards injured Plaintiff, but only his account about how they fell.[4]

True, "biomechanical engineering is closely related to, and may sometimes overlap with, the field of medicine." *Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at \*10 (W.D. Tex. Mar. 24, 2021) (citations omitted).  "But the two disciplines remain distinct mainly because, unlike medical doctors, 'biomechanical engineers do not diagnose and treat human physical ailments, conditions, diseases, pain, and infirmities.'"  *Id.*

---

[3] *See, e.g.*, June 18, 2025 Trial Tr. at 173:17-24 ("I'm here as a biomechanical engineer. And I should probably define biomechanics that might be helpful, but a biomechanical engineer, which is typically using the techniques we use in physics and engineering and mathematics, linking that with issues in life sciences of biology and physiology and anatomy, trying to get at questions of how the human being interacts with the environment either in a performance or an injury setting."); *id.* at 202:25–203:3 ("Q. You're not a medical doctor, correct? A. Correct. Q. You don't make medical diagnoses, correct? A. I don't. Q. You're not going to disagree with any medical diagnoses made by any medical doctors, right? A. Correct.").

[4] *See, e.g.*, *id.* at 191:5–196:8 (explaining how he concluded that it was impossible for boards to hit Plaintiff's left jaw "based upon [his] analysis as a biomechanic in physics and the site geometry"); June 23, 2025 Trial Tr. at 21:25–22:4 ("Q. Okay, Thank you, sir. I mean, respectfully, we do understand that you're claiming, based on geometry and physics, [Plaintiff] couldn't possibly have been hit the way he's claiming, right? A. That's right."); *id.* at 22:20–23:5 ("Q. Okay. Your conclusion was the same in the Houston case and this case, though, correct? A. The general conclusion that wood falls in accordance with the laws of physics, based on geometry and friction, and they fall close to the shelves. And those are the very similar characteristics of these two cases. Q. Okay. I'll ask again. Your conclusion was the same, that the customer was inconsistent in his account of how he could have been hit by the boards, correct? A. Yes, the description of where he was hit and how, is inconsistent.").

As the Court did here, other district courts have allowed biomechanical engineers to offer opinions "about the forces generated by accidents and the probable effects of such forces on the human body, but not about whether the particular accident at issue is the cause of the plaintiff's injuries." *Herrera v. Werner Enters., Inc.*, No. SA-14-CV-385-XR, 2015 WL 12670443 at \*3 (W.D. Tex. Sept. 28, 2015) (collecting cases). So, contrary to Plaintiff's argument, the introduction of his emergency room records would not have refuted Dr. Broker's biomechanical testimony. *See* Mot. at 19. At best, these medical records would have only supported that Plaintiff suffered an injury, not that the lumber stack collapsed in the way he claimed it did.

Nor did Plaintiff suffer any prejudice from the admission of Dr. Broker's biomechanical testimony, as he claims. As reiterated throughout this Memorandum Opinion and Order, Plaintiff was not barred from presenting injury and causation evidence. Indeed, he did present such evidence. *See supra* section I, A, b. And most notably, Plaintiff had the opportunity to present rebuttal witnesses after Defendant rested its case but chose not to do so. *See* June 23, 2025 Trial Tr. at 6:6–16.

Thus, the Court concludes that Plaintiff has failed to show that "it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done" by the admission of Dr. Broker's biomechanical testimony. *Jordan*, 977 F.3d at 417.

## CONCLUSION

For all these reasons, the Court **DENIES** Defendant Home Depot, U.S.A., Inc.'s "Motion for a New Trial" (ECF No. 122).

**So ORDERED and SIGNED this <u>17th</u> day of February 2026.**

**ANNE T. BERTON
UNITED STATES MAGISTRATE JUDGE**